

**U.S. Department of Justice**

Complaint Adjudication Office

Agency Complaint Number I-00-C048
DJ Number 187-4-1555

_____

*Post Office Box 65468*
*Washington Square Station*
*Washington, DC 20035-5468*

FEB   6   2002

DEPARTMENT OF JUSTICE FINAL DECISION

in the matter of

<u>Manuel Perez, Jr. v. Immigration and Naturalization Service</u>

On January 5, 2000, complainant Manuel Perez, Jr., filed a complaint of discrimination against the Immigration and Naturalization Service (INS), pursuant to Section 501 of the Rehabilitation Act of 1973, as amended 29 U.S.C. §791. Complainant alleged that he was discriminated against on the basis of his physical disability when subsequent to suffering an on-the-job injury, he failed to receive regularly scheduled Within Grade Increases, he was not allowed to return to work in a limited or light duty capacity, and management officials failed to properly process his Office of Worker Compensation Programs disability compensation claim forms and related documentation. As relief, complainant requested back pay, restoration of annual and sick leave, placement in another position, compensatory damages, and attorney's fees.

Procedural History

Complainant contacted an Equal Employment Opportunity (EEO) Counselor on December 3, 1999 (Ex. 3, EEO Counselor's Report, p. 2).[1]  When counseling did not resolve matters, complainant filed his complaint on January 5, 2000 (Ex. 2, Complaint Receipt Letter, dated January 13, 2000).  The following issue was accepted for investigation (Ex. 2, Complaint Acceptance Letter, dated August 10, 2000):

Complainant alleges that he was discriminated against on the basis of his physical disability when:

_____

[1]Abbreviations contained in this decision are as follows: "Ex." for Exhibit; "CF" for Correspondence File; and "IR" for Investigative Record.

**Exhibit B**

**Page 1 of 20**

- 2 -

1. Since June 15, 1994, and subsequent to suffering an on-the-job injury, complainant allegedly has not received regularly scheduled Within Grade Step Increases.

2. Between October 29, 1996, and March 23, 2000, the agency did not allow complainant to return to work in a limited or light-duty capacity.

3. Since August 6, 1998, agency officials have allegedly failed to properly process complainant's Office of Worker Compensation Programs (OWCP) disability compensation claim forms and related documentation. It is alleged that "this failure caused a tremendous process delay" with regards to receiving authorization for various medical procedures and the issuance of compensation payments by OWCP.

An EEO Investigator was contracted to investigate the complaint (IR, p. 1). On December 26, 2000, upon completion of the investigation, the INS EEO Office provided complainant with a copy of the Report of Investigation along with a letter informing him that he could elect between an administrative hearing and a final agency decision without a hearing (CF, Letter to Complaint Adjudication Office from INS EEO Office dated February 9, 2001). On January 24, 2001, complainant requested a final agency decision, and on February 12, 2001, the Complaint Adjudication Office received the investigative and correspondence files for a Department of Justice (DOJ) Final Decision (ibid).

## Discussion

Complainant alleged that because of his physical disability subsequent to suffering an on-the-job injury, he failed to receive regularly scheduled Within Grade Increases, he was not allowed to return to work in a limited or light duty capacity, and management officials failed to properly process his Office of Worker Compensation Programs disability compensation claim forms and related documentation. Section 501 of the Rehabilitation Act of 1973, as amended 29 U.S.C. §791, prohibits discrimination against qualified individuals with disabilities because of their disability.

## Background

Complainant, a GS-7 Immigration Detention Enforcement Officer at the Port Isabel Service Processing Center (Port Isabel), Los Fresnos, Texas, said that he sustained an on-the-job

- 3 -

injury on June 15, 1994 (Ex. 6, p. 2). Complainant said that he suffered injuries to his neck, right shoulder, right arm, and back during a training session on defensive tactics (ibid). Complainant said that he reported his injury immediately (no later than twenty-four hours after the incident) to his first-line supervisor at the time, George Gonzalez, the Supervisory Chief Detention Enforcement Officer (ibid). Complainant said that Gonzalez endorsed his injury claim as a witness, and submitted the claim through the proper channels, because he received a worker's compensation claim number thirty days later, plus authorization for an examination by agency physicians (id. at 2-3).

Complainant said that he saw several agency physicians and his primary physician since the date of his injury and his primary physician, Dr. Rivas (first name not given), after a visit in June 1996, suggested that complainant be placed in a limited duty status (Ex. 6, pp. 3-4). Complainant said that Rivas suggested that complainant should continue in that status while he referred complainant to an orthopedist for further evaluation and diagnosis (id. at 4). Complainant said that the orthopedist, Dr. Gregory Goldsmith, subsequently notified management officials that complainant should be continued in a limited duty status (ibid). Complainant said that management officials at Port Isabel provided him with duties which were less stressful and strenuous, for a period which lasted until August 1996 (ibid). Complainant said that management officials did not provide him any particular accommodations for the performance of these duties, and noted that he did not request anything in a addition to that recommended by the doctors (ibid).

Complainant said that at the end of his limited duty status period, in August 1996, he went on leave-without-pay status until October 1996, because he could not perform any duties at all, due to the increased severity of his pain (Ex. 6, p. 4). Complainant said that when he attempted to return to work at the end of October, 1996, Janice Hernandez, the Harlingen District Administrative Officer, informed him that the only way in which management officials would allow him to continue receiving his salary would be for complainant to return to his regular position in the normal duty status (ibid). Complainant said that since he did not have medical authorization to return to normal duty status at the time, he subsequently spent the period from October 1996, to March, 2000 in a complete non-duty status with no salary or benefits (ibid). Complainant said that at the time he gave his affidavit, September 27, 2000, INS had failed to provide him with compensation for the injury that caused his disability (ibid). Complainant noted that he was evaluated finally in March

**Exhibit B**

**Page 3 of 20**

- 4 -

2000, and was finally cleared to return to work in a limited duty status (id. at 10).

Complainant also contended that since June 15, 1994, and subsequent to suffering his on-the-job injury, he has not received his regularly scheduled Within Grade Step Increases (Ex. 6, p. 6). Further, complainant claimed that since August 6, 1998, INS officials have failed to properly process complainant's Office of Worker Compensation Programs (OWCP) disability compensation claim forms and related documentation (id. at 7). Complainant claimed that "this failure caused a tremendous processing delay" with regards to receiving authorization for various medical procedures and the issuance of compensation payments by OWCP (ibid).

Accommodation Claim

    1.   Substantially Limiting Impairment

Under the Rehabilitation Act, a qualified complainant with a disability will have been discriminated against if management fails to provide the complainant with reasonable accommodation such that he can perform the essential duties of his position. The initial questions that must be addressed in any disability discrimination case is whether complainant is a person with a disability and if so, whether the complainant is a qualified individual with a disability within the meaning of the Rehabilitation Act.

An employee is considered to have a disability covered under the Rehabilitation Act if the employee "has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such an impairment." 29 C.F.R. §1614.203(a)(1). A physical or mental impairment is described under the Act as (29 C.F.R. §1614.203(a)(2)):

> Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, cardiovascular, reproductive, digestive, respiratory, genitourinary, hemic and lymphatic skin, and endocrine; or any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

- 5 -

Major life activities are defined under the Act as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §1614.203(a)(3).

The record shows that complainant has a disability within the meaning of the Rehabilitation Act. Complainant asserts that he is physically disabled because of an on-the-job injury that caused injuries to his neck, right shoulder, right arm, and back (Ex. 6, p. 2). Complainant said that his disability substantially limits his ability to perform major life activities such as prolonged walking, sleeping soundly at night, and handling anything weighing more than fifteen pounds (id. at 5). Complainant said that his disability limits his ability to perform these activities because of the severe and constant pain (ibid). Complainant has a disability within the meaning of the Rehabilitation Act.

  2.  Qualified to Perform the Essential Functions of the Job

The next question is whether complainant is a "qualified" individual with a disability under the Rehabilitation Act. A person is considered otherwise qualified if the person "with, or without accommodation, can perform the essential functions of the position without endangering the health and safety of the individual or others...." 29 C.F.R. 1614,203(a)6).

The position description for a Journeyman Detention Enforcement Officer stated that on a day-to-day basis, the incumbent must be able to perform journeyman tasks in any of the 3 operating environments (Ex. 11, p. 2). The position description also stated that the incumbent primarily performs tasks involving the location, apprehension/arresting, transporting, safeguarding, overseeing/supervising, and processing of aliens being detained and/or deported for violation of immigration laws (ibid). The major duties of the position included being a processing officer as well as a security officer (id. at 2-3). Complainant said that the essential functions of his job were to enforce U.S. immigration laws by properly, safely, and humanely detaining illegal aliens during the processing stage for the eventual deportation of the aliens to their home countries (Ex. 6, p. 6).

Supervisory Detention Enforcement Officer George Gonzalez said that the essential function of complainant's job is to detain illegal aliens while the aliens are being processed for

- 6 -

deportation to their home countries (Ex. 7, p. 4). Gonzalez said
that since he never assigned complainant any light-duty work
after complainant was injured, he could not say whether light
duty would or would not have allowed him to perform the essential
functions of his job (ibid).

Evidence in the record suggests that complainant was unable
to perform the essential functions of his position without
accommodation. The record shows that complainant was placed on
light duty status from June 1996 to August 1996. In addition,
complainant said that he went on leave-without-pay status from
August 1996 to October 1996 because he could not perform any
duties at all in his position, due to the severe pain he
experienced because of his disability. This evidence shows that
complainant could not perform the essential functions of his
position without reasonable accommodation. Complainant contends
that management officials discriminated against him because of
his disability when they failed to provide him further reasonable
accommodation from October 1996 to March 2000.

3.   Reasonable Accommodation

The Rehabilitation Act protects otherwise qualified federal
employees with disabilities by requiring the employer to provide
reasonable accommodations. School Board of Nassau County v.
Arline, 480 U.S. 273, 275-278 (1987). The question that must be
asked is whether complainant could have performed the essential
functions of his position with reasonable accommodation.

Complainant said that he believed that the agency's refusal
to allow him to return to work in a limited or light-duty status
between October 29, 1996, and July 14, 1998, the date of his
surgery to his right shoulder, was discrimination (Ex. 6, pp. 6-
7). Complainant said that from July 14, 1998, to March 23, 2000,
he was in a no-duty status, recuperating from surgery, going
through physical therapy, and awaiting the OWCP approval for an
MRI (id. at 7). Complainant said that no one from the agency
informed him as to why the agency would not continue him in any
duty status, other than full-duty status, after October, 1996
(ibid). Complainant said that he had sufficient medical evidence
to have justified a limited duty status after October 1996, and
from the very beginning, provided the agency with medical
documentation supporting his continued limited duty status beyond
October, 1996 (ibid). Complainant said, "Additionally, this
evidence proves that I cannot perform the essential functions of
my regular position without some proper accommodations" (ibid).

- 7 -

Complainant contended that he was discriminated against because of his disability resulting from his on-the-job injury as evidenced by (Ex. 6, pp. 5-6),

> the shoddy manner in which the agency treated me from August, 1996, to the present; the conduct of the agency on October, 1996, wherein I was informed that I would have to return to a full-duty status in order to receive my salary, when the agency knew full well that my physicians were still evaluating and diagnosing my disability, with sustained recommendations to keep me in a limited duty status; by the manner in which Mr. Trominski misrepresented the facts of my case to Congressman Solomon Ortiz, twisting details in order to make it appear that the agency was properly handling the matter; by the fact that the agency treated another employee (Guillermo Carmona) with a very similar disability sustained also from an on-the-job injury in a much better fashion, providing proper and expeditious processing of all applicable documents and overall better consideration (including the providing of a nurse at his home during recovery); and in general, by the manner in which the agency's management officials handled my file and further misrepresented the facts of my case, giving me the impression that they were representing my best interests, which turned out not to be the case.

Administrative Officer Janice Hernandez said that she was aware of complainant's on-the-job injury (Ex. 8, p. 2). Hernandez said that agency records indicated that complainant promptly submitted his report, but in going about obtaining the necessary medical information from his physicians, complainant failed to have the physicians include information necessary for the agency to determine work status and possible duty limitations (ibid). Hernandez said that as a result, complainant's claim for compensation from OWCP was delayed in its processing and in OWCP granting monetary compensation payments to complainant (ibid). Hernandez said that once the agency was legally able to do so, it assigned the complainant to less demanding duties, a period which lasted from August 1996, to October 1996 (id. at 2-3). Hernandez said that the agency had no position or other duties at the time to which it could assign the complainant, and under the circumstances, felt then that that was the proper action to take (id. at 3).

Hernandez reiterated that the agency did not assign complainant less demanding duties from June, 1994, when his injury occurred, to August, 1996, because of the delay caused by the incomplete medical information complainant obtained, which

- 8 -

was his responsibility (Ex. 8, p. 3). Hernandez said that the agency had no authority to make any adjustments to complainant's duties until it had received the proper medical information, some two years after the injury in question (ibid). Hernandez said (ibid):

> These less demanding duties constituted what the agency, under the circumstances, considered appropriate job accommodations, accommodations which the agency decided [it] should provide after reviewing the necessary medical information. The agency's policy on providing job' accommodations for any injury sustained by any employee while on official duty is guided by the circumstances of each case; i.e., the nature of the injury, the results of examination by proper medical authorities, prognosis, any resulting job limitations, and the like. This policy was followed in the complainant's case. The complainant's disability which resulted from the injury in question had nothing to do with the agency's decision pertaining to what the agency described as appropriate job accommodations for the complainant.

Hernandez said that she became aware of medical authorization the complainant received from his physician on or about October 29, 1996, to work in a light-duty status (Ex. 8, p. 4). Hernandez said that the agency assigned complainant what it considered at the time "light duty" (ibid). Hernandez said that the medical information the agency received to assumingly cover a period after October 1996 was insufficient, therefore, the agency did not authorize any further "light duty" (ibid). Hernandez said that she informed complainant that he could not return to work after October 1996, unless it was in a full-time duty status (ibid). Hernandez said, "My rationale for telling the complainant that he could not return to work after October 1996 was in accordance with agency policy, which is determined, as I have explained, by complete medical information the agency receives from proper medical authorities" (ibid).

On September 13, 1996, Hernandez wrote complainant and requested additional information for his request for leave without pay (Ex. 14, p. 67). Hernandez stated (id. at 67-68),

> The documentation that you have presented thus far does not meet your burden of producing administratively acceptable evidence and detailed medical documentation from a licensed physician or other appropriate practitioner to show that you have been incapacitated from August 1 through the present date, due to illness and have been unable to perform your

- 9 -

duties as a Detention Enforcement Officer during the entire period of your absence.  I understand from you that you have been in considerable pain but the medical documentation should be submitted as soon as possible.

Hernandez told complainant his medical documentation should include a history of his medical condition, a diagnosis and prognosis of his medical condition, a narrative explanation of the impact of his condition on his life activities, both on the job and off, and whether restrictions or accommodations were warranted, and finally, a narrative explanation regarding the medical basis for any conclusion that he might or might not suffer injury or harm by carrying out, with or without accommodation, the tasks and duties of his position at work (id. at 68).

On October 8, 1996, Dr. Ruy Mireles submitted an Initial Medical Report to the Office of Worker's Compensation (Ex. 14, p. 34).  Mireles noted that complainant complained of pain on the right shoulder and stated that he was going to have surgery on his right shoulder (id. at 35).

Hernandez said that the complainant did not submit any further medical information from his physician after October 1996, and complainant was in a non-working status with the agency from October, 1996, to March, 2000 (Ex. 8, p. 4).  Hernandez said that the agency "treated the possibility of extended light duty for the complainant beyond October, 1996, in the same fashion-applying required criteria in terms of the necessary, available medical information--which is the same manner in which the agency treats any request for light duty anytime after an employee sustains an on-the-job injury" (id. at 4-5).

District Director E.M. Trominski reiterated Hernandez's testimony (Ex. 9, pp. 4-5).  Trominski said that complainant's disability had nothing to do with any actions and decisions pertaining to complainant's work status (id. at 5).

Hernandez said that she did not inform complainant that the disability he allegedly sustained due to an on-the-job injury suffered on June 15, 1994, had no justification for reasonable job accommodations (Ex. 8, p. 5).  Hernandez stated, "As I have said, the agency assigned the complainant less demanding duties while he was in a light-duty status, properly documented by complete medical documentation.  For the purpose, the agency considered then that this assignment met the intended definition of accommodations" (id. at 5-6).  Trominski reiterated this as well (Ex. 9, p. 5).

- 10 -

On May 5, 1997, Chief Detention Enforcement Officer Jesus Rosales wrote complainant inquiring about his medical status (Ex. 14, p. 74). On May 20, 1997, and June 4, 1997, Duty Operation Supervisor George Gonzalez informed Center Administrator Roel Delgado that complainant was unable to give him a current prognosis of his medical condition at that time because his doctors' appointments kept getting rescheduled (id. at 77-78).

On July 29, 1997, Gonzalez informed Delgado that he spoke with complainant the day before to get an update on his medical condition (Ex. 14, p. 71). Gonzalez said that complainant told him that he was going to therapy sessions three times a week to keep his shoulder from inflammation, and that his doctor did not want him to do anything else (ibid). Gonzalez said he reminded complainant to inform management of his medical status after August 4, 1997 (ibid).

The record contained two notices from Dr. Francis Sweeney regarding complainant's inability to work in 1997 (Ex. 14, pp. 15-16). The first, dated August 4, 1997, stated that complainant was unable to work for three weeks, and the second, dated August 26, 1997, said that complainant was unable to work until further notice because he was waiting approval for surgery (ibid).

On September 11, 1997, Hernandez wrote a letter to Sweeney at the Rio Grande Orthopaedic Institute asking about the latest medical release for complainant, dated September 9, 1997, that he had received from Sweeney's office (Ex. 14, p. 31). Hernandez said the medical release stated that complainant was Sweeney's patient and was unable to return to work until further notice waiting approval for surgery (ibid). Hernandez said that a prior release from Sweeney's office, dated August 4, 1997, stated that complainant was unable to work until three weeks, and there was no mention of a possible surgery (ibid). Hernandez stated that Al Bresna of the Department of Labor, Office of Worker's Compensation, in Dallas, Texas, told her that there were no requests for any type of surgery in any of complainant's files, nor was there any supporting evidence indicating that surgery was needed (ibid). Hernandez stated (ibid),

This letter will serve as a request for your office to submit the necessary information to the...Office of [Worker's] Compensation...to support the need for the specific surgery that [complainant] needs in order for him to recover fully and be able to return to work. [Complainant] has been away from work for over one year, since August 1, 1996. As his employers we are concerned about this length of time and we would like to ensure that

- 11 -

[complainant] will be able to recover fully and return to
his normal lifestyle.  Please send an information copy
directed to my attention...for [complainant's] file.

In a March 31, 1998, Memorandum to file, Delgado stated that
he spoke with complainant on March 26, 1998, to get an update on
complainant's injury (Ex. 14, p. 27).  According to Delgado,
complainant told him that his doctor would not release him to
return to work until he had surgery on his right shoulder (id.).
Delgado also stated that complainant told him that his doctor
would only allow him to perform light duty, such as answering the
phones (ibid).  Delgado said that complainant informed him that
he could not move his right shoulder due to the severity of the
pain (ibid).

An attachment to complainant's claim on account of traumatic
injury or Occupational Disease (CA-7), dated December 10, 1998,
stated that complainant asked for leave-without-pay on August 1,
1996, and it was granted to him for one year (Ex. 14, pp. 25-26).
In addition, the attachment noted that complainant had not
returned to work since that date, and the Harlingen District had
not received a request with supporting medical documentation for
additional time off under leave-without-pay due to a worker's
compensation claim (id. at 22-26).

At the end of October or beginning of November, 1999,
complainant requested an extension of his leave-without-pay
status to October 1, 2000, which he said should have expired on
October 1, 1999 (Ex. 14, pp. 43-44).  On November 9-10, 1999,
Assistant District Director Cecilio Ruiz and Delgado recommended
to Trominski that complainant's request for an extension be
denied because complainant's physician's report, submitted with
his request, contained only a brief statement that complainant
"is unable to return to work until further notice" (id. at 39-40,
43-45).  Ruiz and Delgado said that complainant's request failed
to provide any documentation describing his current medical
condition, a prognosis for treatment, nor an outline of any
physical limitations placed on his activities (ibid).  Ruiz noted
that at that time, several jobs were available in the Harlingen
Detention/Deportation Section which would qualify as "light duty"
positions (id. at 39).

On November 2 and 4, 1999, Gonzalez and Rosales informed
Administrative Officer Hernandez of any conversations they had
had with complainant from August 28, 1998, until that time (Ex.
14, pp. 46-47).  While Gonzalez stated that he had not had any
conversations with complainant, Rosales mentioned that he had a
teleconference with complainant and complainant's attorney on May

- 12 -

13, 1999 (id. at 46). In a memorandum to Ruiz dated May 14, 1999, Rosales summarized his conversation with complainant the previous day (id. at 49). Rosales stated that he informed complainant that they needed updated medical evidence indicating that he was still incapacitated and/or could not return to work (ibid). Rosales said that complainant stated that he had been operated on, but had not provided this information to the district or their office (ibid). Rosales also stated that complainant's attorney claimed he had sent letters to Trominski's office on December 15, 1998, January 26, 1999, and March 2, 1999, regarding complainant's compensation claim, but he had not received a response (ibid). Rosales said that he told complainant he would check on the letters and complainant agreed to provide updated information regarding his medical condition (ibid).

On May 17, 1999, complainant's attorney, T. Mark Blakemore, stated that complainant had continuously provided updates regarding his medical information to Hernandez whenever he had any new information for his file regarding his medical condition (Ex. 14, p. 51). Blakemore stated that complainant would not have been approved for surgery if proper documentation had not been received (ibid).

When an otherwise qualified employee who is disabled requests accommodation, it is expected that the employer and employee engage in an interactive process to determine what reasonable accommodation should be provided to the employee. Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996). Here, the record shows that INS management officials allowed complainant to work in a "light duty" capacity from June to August 1996. Complainant said that he was unable to work from August to October 1996, because his pain was too severe. This evidence suggests that complainant and management officials engaged in the interactive process over the course of a few months to determine a reasonable accommodation for complainant.

Complainant now claims that management refused to allow him to work in a limited or light duty capacity from October 1996 to March 2000, and therefore, discriminated against him because of his disability when they failed to provide him this reasonable accommodation. Hernandez contended that complainant failed to provide additional medical documentation that was necessary to determine whether complainant could be reasonably accommodated in a light duty capacity after October 1996. The record shows that management officials continuously asked complainant to provide specific additional medical documentation explaining his current

- 13 -

diagnosis, prognosis, and request for accommodation that would
allow him to perform his duties.

Exhibit 14 in the record contains various documentation
related to complainant's medical condition and also shows that
management continuously requested updates from complainant. The
most detailed request was one submitted by Hernandez in September
1996, asking complainant's physician to provide the diagnosis,
the prognosis, and the reasonable accommodation needed. There is
no indication that complainant provided a detailed response to
the requests. A close review of this evidence shows that none of
the evidence submitted by complainant sufficiently explained to
management officials his current prognosis or his ability to
perform the essential functions of his position with or without
reasonable accommodation. Instead, most of the information from
complainant or complainant's physician simply stated that he
suffered from an injury, or that complainant was unable to return
to work "for three weeks" or "until further notice," without any
further explanation on the status of complainant's disability.
Given that complainant himself stated that he had been unable to
work from August to October 1996, because of the severe pain he
experienced, it was reasonable for management officials to
request further medical information to satisfy any light duty
requests from complainant after October 1996. When complainant
failed to honor this request, management officials reasonably
concluded that they were unable to allow complainant to work in a
limited capacity until they received the necessary medical
documentation.

Complainant claimed that management officials knew that his
doctors were still evaluating and diagnosing his disability with
continued recommendations to keep him in a limited duty capacity.
Complainant also contended that management treated another
employee, Guillermo Carmona, with a very similar disability in a
more favorable manner by giving him more consideration for his
disability.

Immigration Detention Enforcement Officer Guillermo Carmona
said that he had a disability which resulted from an on-the-job
injury September 3, 1997 (Ex. 10, p. 2). Carmona said that when
he sustained his on-the-job injury, the agency treated him in
what he considered a fair manner (ibid). Carmona said that INS
processed his injury report in a timely and proper fashion,
through his supervisory chain of command (ibid). Carmona said
that while he was recuperating, the agency also placed him in a
light-duty status for approximately one month initially, and
subsequently from May 2000, to the time of his affidavit on
September 4, 2000 (ibid). Carmona said that while on this

- 14 -

status, INS further provided what he considered at the time
appropriate job accommodations (ibid). Carmona said, "During the
time of my recovery, even while I was on light duty I never
experienced any difficulty in obtaining tests and procedures
recommended or ordered by any of the physicians who were treating
me" (ibid).

Although complainant contended that Carmona was treated
differently, the record failed to present any evidence that
Carmona was treated differently for any discriminatory reason.
What the record does show is that the medical information
provided by complainant never mentioned anything regarding
complainant's work status, other than the fact that he was unable
to work at various times during the time he was on leave-without-
pay. As Hernandez stated, evidence in the record showed that
none of the documentation provided by complainant's physicians or
complainant was sufficient to determine complainant's work status
or possible duty limitations. This evidence strongly suggests
that because of complainant's failure to provide relevant
information regarding his work status, management officials were
prevented from determining whether complainant could perform the
duties of his position without accommodation, or with
accommodation such as light duty.

Over the three and a half year period complainant was off
from work, the record showed that management officials repeatedly
asked him to provide an update on his medical condition and work
status. Management's failure to rely on complainant's previous
documentation, which allowed him to work in a light duty status
from June to August 1996, to determine an appropriate reasonable
accommodation after October 1996 was reasonable given that
complainant had been unable to work at all from August to October
1996. Although complainant's attorney claimed that complainant
had provided updates to management, evidence in the record shows
that any information submitted by complainant failed to provide
sufficient or specific information updating management on
complainant's condition and his ability to perform the essential
functions of his position with or without accommodation. Here,
"[complainant's] failure to provide medical information necessary
to the interactive process precludes [him] from claiming that
[INS] violated the [Rehabilitation Act] by failing to provide
reasonable accommodation." Templeton v. Neodata Serv., Inc., 162
F.3d 617, 619 (10th Cir. 1998).

Discrimination Claim

Complainant said that he believed that since June 15, 1994,
and subsequent to suffering his on-the-job injury, INS's denial

- 15 -

of his regularly scheduled within-grade step increases has been
due to his disability (Ex. 6, p. 6). Complainant said that he
had never been informed of the denial of any of his step
increases, and he had never been counseled about his work
performance as it pertained to the increases (ibid).

Hernandez said that the agency continued to grant
complainant his regularly scheduled, approved within-grade step
increases after his injury June 15, 1994 (Ex. 8, p. 6).
Hernandez said, however, once the complainant went on a no-duty
status from October 1996 to March 2000, the increases ceased
(ibid). Hernandez said that this was so because an employee in
the agency must be in some duty status, even a light-duty status,
in order to be eligible for step increases (ibid). Hernandez
said, "In the case of the complainant, he was in total non-duty
status from October 1996 to March 2000; therefore, the agency
could not legally increase his salary with step increases when he
was not on duty at all. This is a federal government employment
regulation, not an agency regulation" (ibid). Hernandez said
that since complainant was back on a full-duty status, he was now
current on his step increases (ibid). Hernandez said that she
did not counsel complainant about his work performance and
possible deficiencies that could delay his step increases (ibid).
Hernandez said that complainant's disability, which resulted from
the injury in question, had nothing to do with the agency's
withholding of his step increases (ibid). Trominski reiterated
Hernandez's testimony (Ex. 9, pp. 5-6). Trominski stated, "By
letter, I did tell Congressman Solomon Ortiz, who had intervened
on behalf of the complainant, that within-grade step increases
are "automatic," but I meant it in the context that an employee
must obviously be in some duty status at the time of each
increase, and be performing his or her duties in an acceptable
manner" (id. at 6).

The record fails to present sufficient evidence to rebut the
legitimate, nondiscriminatory reasons presented by management
officials for why complainant did not receive his regularly
scheduled within grade increases. Although the record did not
contain the federal regulation Hernandez and Trominski referred
to for not granting complainant his step increase, it is
reasonable to conclude that since complainant was in a no-duty
status, he should not have received his within grade increases.
More important, neither the record nor complainant presented
evidence to show that management's decision to withhold his step
increases while complainant was in a non-duty status was
motivated by disability animus. Thus, complainant's
discrimination claim for this issue fails.

- 16 -

Complainant also said that he believed that the failure of
agency officials to properly process his OWCP disability
compensation claim forms and related documents, was
discrimination (Ex. 6, p. 7). Complainant said that he timely
completed his portions of the required agency documents after his
injury, and submitted them to Gonzalez, his first-line
supervisor, for continued processing and forwarding to higher
channels (ibid). Complainant stated that although he had
submitted the proper documentation and medical information with
his CA-7 form (Claim for Compensation on Account of Traumatic
Injury form) to support his second claim for compensation for a
traumatic injury, several weeks later, he received a letter from
OWCP stating that INS had failed to complete its portion of his
claim that provided medical information and documentation to
support complainant's claim (id. at 7-8). Complainant said,
although he had provided this information and documentation to
the agency when he submitted the claim, he was informed by
Hernandez that the agency merely had written "same as other' to
substantiate the medical items (ibid). Complainant said that
Hernandez told him that this referred to the same medical
information and documentation that complainant had provided for
his first claim for compensation for a traumatic injury (id. at
8-9). Complainant said that at the time of his affidavit on
September 27, 2000, he had not received anything for his first
OWCP claim, no response from OWCP or the agency, or anything from
anyone (id. at 9).

According to complainant, had the agency properly completed
its portion of his claim, the result would have been a work
schedule approved by OWCP which is based on the employee's injury
and what the OWCP believes is the proper type and length of
revised work for the employee (Ex. 6, p. 9). Complainant said
these failures have caused a tremendous processing delay in
receiving authorization for various medical procedures and the
issuance of compensation payments by OWCP (ibid). Complainant
said that the requests for an MRI and EMG from one of his
physicians that was forwarded to INS, was denied by OWCP (ibid).
Complainant said that once Congressman Ortiz intervened on his
behalf, all of these requests were approved (ibid). Complainant
said that because management officials failed to properly process
his claim, his payment of compensation from OWCP was affected,
and surgery for his right shoulder was delayed because there was
a delay in him getting an MRI (ibid). Complainant said that OWCP
informed INS that it had failed to submit a totally complete
claim (ibid). Complainant also stated that several of his
surgery requests were not approved by OWCP until approximately 10
months after his requests were made (id. at 9-10). Complainant
stated that the delays caused by INS officials caused delays in

- 17 -

his receiving compensation payments and light-duty status, plus a
loss of wages (id. at 10).

Trominski said that although complainant promptly submitted
his report for the injury he sustained on June 15, 1994, in going
about obtaining the necessary medical information from his
physicians, he failed to have the physicians include information
necessary for the agency to determine work status and possible
duty limitations (Ex. 9, p. 2). Trominski said that as a result,
complainant's claim for compensation to OWCP was delayed in its
processing and in the OWCP granting monetary compensation
payments to complainant (ibid).

Hernandez said that she was aware of one problem complainant
was having in October 1996 to March 2000 in obtaining
authorization for medical treatment, specifically shoulder
surgery (Ex. 8, p. 5). Hernandez said that she inquired about
this matter with OWCP, and Al Bresna at OWCP informed her on
September 11, 1997, that OWCP had not made a request for such
treatment (ibid). Hernandez said that she then asked
complainant's physician, Francis Sweeney, by mail to please
submit the request for surgery to OWCP (ibid). Hernandez said
that this was the last she heard about this matter (ibid).

Hernandez said that she also became aware of a problem
complainant was having abut the same time period over the
question of his compensation payments from OWCP (Ex. 8, p. 5).
Hernandez said that she called OWCP again and was told that OWCP
had not yet received the required CA-7 form from complainant
(ibid). Hernandez said that she then faxed a copy of the CA-7
form that the agency had received from the complainant (ibid).
Hernandez said that it was a copy of the original CA-7 form the
agency had already sent to the OWCP (ibid). According to
Hernandez, approximately two weeks later, OWCP called and told
her that the form was incomplete with no pay information (ibid).
Hernandez said that she immediately called OWCP and provided the
necessary pay data (ibid). Hernandez said that complainant's
disability had nothing to do with her actions and decisions
pertaining to complainant's work status (ibid).

Hernandez said that the agency, since August 6, 1998, has
not failed to properly process the complainant's OWCP disability
compensation claim form CA-7 (Ex. 8, p. 6). Hernandez said, "I
did write the phrase "same as other" on the complainant's CA-7
form before the agency forwarded the form to OWCP (id. at 6-7).
Hernandez said (id. at 7),

- 18 -

I did it because it reflected that the alleged injury that the complainant was using as the basis for his compensation claim was the same injury he had cited on his injury report from June, 1994, and if there were any other medical information required to substantiate the injury and resultant claim that it was the responsibility of the complainant to have obtained and submitted with his CA-7 form.  In this instance, the complainant failed to provide current and necessary medical information.  The agency's policy on processing a disability compensation claim form CA-7 submitted by an employee is to complete the agency's portion, minus necessary medical information, as I have explained.

Hernandez said that this was the policy that was followed in complainant's case (ibid).  Hernandez said that complainant's disability had nothing to do with the manner in which the agency processed his disability compensation claim form CA-7 (ibid).  Trominski reiterated Hernandez's testimony (Ex. 9, pp. 6-7).

Hernandez said that she was aware of a similar on-the-job injury and resulting disability, sustained in the past, by Guillermo Carmona, another employee assigned to Port Isabel (Ex. 8, p. 7).  Hernandez said that Carmona's case in its entirety was handled in accordance with agency policy, as was complainant's (ibid).  Hernandez said that agency records showed that Carmona obtained all the necessary medical information for processing his injury report, compensation claim, and other subsequent documents (ibid).  Hernandez said that her role in Carmona's case was basically the same as the one she played in complainant's case, that is, as the district's administrative officer she ensured that each case was handled in accordance with applicable agency policy and available medical documentation submitted by each employee (id. at 7-8).  Trominski reiterated Hernandez testimony here as well (Ex. 9, p. 7).

Carmona said that he began receiving worker's compensation within a 180 days of his injury (Ex. 10, p. 2).  Carmona said with the exception of a three-month period, he received all pay due to him, from the date of his injury to the date of his affidavit (id. at 2-3).  Carmona said that OWCP informed him that the problem with the delay in his pay, was that the CA-7 document in his case had not yet been received (id. at 3).  Carmona said that after he mentioned this discrepancy to INS, he received a check for the full amount of what had been due to him, and regular checks each month thereafter (ibid).  Carmona said that he did not know whether the manner in which INS processed or otherwise handled his injury report was any different from the

- 19 -

way it processed/handled complainant's injury report, how his
worker's compensation was affected any differently than
complainant's, or whether his assignment of light duty was
different than that of complainant's (ibid).

The record presents persuasive evidence that any delay in
complainant receiving his OWCP payments resulted from his delay
in providing management sufficient and appropriate medical
documentation which they had requested.  The record shows that on
November 20, 1997, OWCP wrote complainant requesting specific
medical documentation that was applicable to his right shoulder
injury (Ex. 14, p. 69).  The letter suggested that complainant
had submitted medical documentation for a previous injury not at
issue (ibid).  This letter, combined with the lack of specific
medical information in the record complainant submitted to
management, supports management's contention that complainant's
OWCP process was delayed because he failed to submit the
appropriate medical documentation to management officials.

Further, although Hernandez acknowledged that she simply
wrote "same as before" on one of complainant's CA-7s, neither the
record nor complainant present sufficient evidence showing that
Hernandez did so for discriminatory reasons.  Hernandez said that
it was complainant's responsibility to submit the appropriate
medical documentation to OWCP.  Another letter to complainant
from OWCP on March 9, 1998, showed that complainant's file did
not contain medical information demonstrating a right shoulder
injury as a result of the June 15, 1994 incident, and did not
contain any records of treatment for a right shoulder condition
in 1994 or 1995 (Ex. 14, p. 70).  This evidence further supports
that complainant's failure to provide the appropriate medical
documentation to OWCP and to management officials caused the
delay in him receiving his OWCP payments and the delay in
additional OWCP paperwork he needed for further medical
procedures.  Further, in a letter written to complainant from
OWCP dated August 6, 1998, OWCP stated, "If you did not provide
medical information to the agency which explained in narrative
form the need for light or limited duty, and your specific
physical limitations, resulting from the accepted condition for
your claim, you are not entitled to consideration for payment of
disability compensation" (Ex. 14, p. 56).  Given the lack of
sufficient medical information given to management from
complainant regarding his disability, it is reasonable to
conclude that any delay in complainant's OWCP compensation was
caused by the lack of information provided to them by
complainant.

  
- 20 -

The record presents no evidence that management officials were motivated by discriminatory animus in their handling of complainant's OWCP claims. Evidence in the record showed that management officials continuously requested updates from complainant on his medical status, and the record presents persuasive evidence that it was complainant's responsibility to provide this current and additional medical documentation to management officials as well as OWCP. Complainant's failure to timely submit the requisite medical documentation to the appropriate officials appears to be the reason for any delay in his OWCP claims. Thus, without additional information to rebut this evidence, complainant cannot succeed on his discrimination claim for this issue.

<u>Decision</u>

The totality of the record fails to sustain complainant's claims that he was discriminated against on the basis of his disability.

_____
Mark L. Gross
Complaint Adjudication Officer


_____
Avery L. Johnson
Attorney
Complaint Adjudication Office