# AFFIDAVIT

STATE OF _Texas_

COUNTY OF _Cameron_

I, _Jan Hernandez_ _Anglo Caucasian, Female, 46,_
   (Affiant's Name)    (Affiant's Race, Color, National Origin, Sex, _8-11-54_
                        Age, DOB, Religion, Disability) _Catholic_
                                                         _none_

_Administrative Officer GS-341-11_
(Job Title, Series and Grade,)

_2102 Teege Ave Harlingen Tx_
(Organization's Address, Telephone Number)

make the following statement freely and voluntarily to: **RICHARD SIDA**,

who has identified himself to me as a Contract Investigator for the U.S. Department of

Justice, investigating a complaint of discrimination filed by _Manual Perez_

Knowing that this statement may be used in evidence, I understand that this statement is

not confidential and may be shown to any interested party who has a legal right to know.

I hereby solemnly _Swear_ :
              (Swear or Affirm)

PAGE _1_ OF _9_ PAGES                    INITIALS _JH_

## AFFIDAVIT

My name is Jan Hernandez. I am the Administrative Officer, GS-341-11, assigned to the District Office, U. S. Immigration and Naturalization Service; Harlingen, Texas. I have no disability. I have been in my current position approximately nine years. I know the Complainant as an employee assigned to the Port Isabel Service Processing Center (PISPC) in Los Fresnos, Texas, which is part of the Harlingen district. My work relationship to the Complainant is non-supervisory; I provide administrative support to his work unit as I do to the other units assigned to the Harlingen district. My supervisory chain of command on June 15, 1994 was as follows: Assistant District Director for Management, Deputy District Director, District Director (all Harlingen district). My current supervisory chain of command is the same.

I am aware of an on-the-job injury allegedly sustained by the Complainant on or about June 15, 1994, and of the injury report the Complainant submitted after the injury. Agency records indicate that the Complainant promptly submitted his report, but in going about obtaining the necessary medical information from his physicians, he failed to have the physicians include information necessary for the agency to determine work status and possible duty limitations. As a result, the Complainant's claim for compensation to the Office of Workers' Compensation Program (OWCP) in the U. S. Department of Labor (DoL), was also delayed in its processing and in the OWCP granting monetary compensation payments to the Complainant. Once the agency was legally able to do so, it

Page 2 of 7 Pages                                           ___ Initials

# AFFIDAVIT

assigned the Complainant to less demanding duties, a period which lasted from August, 1996 to October, 1996. The agency had no position or other duties at the time to which it could assign the Complainant, and under the circumstances, felt then that that was the proper action to take. The reason the agency did not assign the Complainant less demanding duties from June, 1994 (when his injury occurred) to August, 1996 is the same to which I have alluded; that is, because of the delay caused by the incomplete medical information the Complainant obtained (which was his responsibility, and not that of the agency), the agency had no authority to make any adjustments to the Complainant's duties until it had received the proper medical information, some two years after the injury in question. These less demanding duties constituted what the agency, under the circumstances, considered appropriate job accommodations, accommodations which the agency decided should provide after reviewing the necessary medical information. The agency's policy on providing job accommodations for any injury sustained by any employee while on official duty is guided by the circumstances of each case; i. e., the nature of the injury, the results of examination by proper medical authorities, prognosis, any resulting job limitations, and the like. This policy was followed in the Complainant's case. The Complainant's disability which resulted from the injury in question had nothing to do with the agency's decision pertaining to what the agency described as appropriate job accommodations for the Complainant.

Page 3 of 9 Pages

Initials

**Exhibit D**

## AFFIDAVIT

I became aware of medical authorization the Complainant received from his physician on or about October 29, 1996 to work in a light-duty status. As I have explained above, the agency assigned the Complainant what it considered at the time as "light duty." However, I must reiterate that it took the Complainant more than two years after his injury in June, 1994 to obtain the necessary medical information for the decision to have been made for assignment of lesser demanding duties covering the period August to October, 1996. The medical information the agency received to assumingly cover a period after October, 1996 was insufficient; therefore, the agency did not authorize any further "light duty," and I did inform the Complainant that he could not return to work after October, 1996 unless it were in a full-duty status. My rationale for telling the Complainant he had to be in a full-duty status after October, 1996 was in accordance with agency policy, which is determined, as I have explained, by complete medical information the agency receives from proper medical authorities. The Complainant did not submit any further medical information from his physician after October, 1996, and he was in a non-working status with the agency from October, 1996 to March, 2000. The agency treated the possibility of extended light duty for the Complainant beyond October, 1996 in the same fashion – applying required criteria in terms of the necessary, available medical information – which is the same manner in which the agency treats any request for light

Page 4 of 9 Pages                                                                                         _____ Initials

## AFFIDAVIT

duty anytime after an employee sustains an on-the-job injury. I was aware of one problem the Complainant was having October, 1996 to March, 2000 in obtaining authorization for medical treatment – specifically, shoulder surgery. I inquired about this with OWCP, and the man with whom I discussed the problem (Al Bresna, September 11, 1997) said that OWCP had no request for such treatment. I then asked the Complainant's physician (Francis M. Sweeney) by mail to please submit the request for surgery to OWCP. That was the last I heard of that. I also became aware of a problem the Complainant was having about the same time period over the question of his compensation payments from OWCP. Again, I called OWCP and was told that OWCP had not yet received the required CA-7 form from the Complainant. I then FAXed a copy of the CA-7 that the agency had received from the Complainant. It was a copy of the agency's copy of the original CA-7 the agency had already sent to the OWCP. About two weeks later, OWCP called and told me that the form was incomplete with no pay information; I immediately called OWCP and provided the necessary pay data. The Complainant's disability had nothing to do with my actions and decisions pertaining to the Complainant's work status.

  I did not inform the Complainant that the disability he allegedly sustained due to an on-the-job injury June 15, 1994 had no justification for reasonable job accommodations. As I have said, the agency assigned the Complainant less demanding duties while he was in

Page 5 of 9 Pages

Initials

Exhibit D
Page 5 of 10

# AFFIDAVIT

a light-duty status, properly documented by complete medical documentation. For the purpose, the agency considered then that this assignment met the intended definition of accommodations.

The agency continued to grant the Complainant his regularly scheduled, approved within-grade step increases after his injury June 15, 1994. However, once the Complainant went on a no-duty status from October, 1996 to March, 2000, the increases ceased. This was so because an employee in the agency must be in some duty status, even a light-duty status, in order to be eligible for step increases. In the case of the Complainant, he was in total non-duty status from October, 1996 to March, 2000; therefore, the agency could not legally increase his salary with step increases when he was not on duty at all. This is a federal government employment regulation, not an agency regulation. Since the Complainant is now back on a full-duty status, he is now current on his step increases. I did not counsel the Complainant about his work performance and possible deficiencies that could delay his step increases. The Complainant's disability, which resulted from the injury in question, had nothing to do with the agency's withholding of his step increases.

The agency, since August 6, 1998, has not failed to properly process the Complainant's OWCP disability compensation claim form CA-7. I did write the phrase "same as other" on the Complainant's CA-7 form before the agency forwarded the form to

Page 6 of 9 Pages                                                                 Initials

**Exhibit D**
**Page 6 of 10**

# AFFIDAVIT

OWCP. I did it because it reflected that the alleged injury the Complainant was using as the basis for his compensation claim was the same injury he had cited on his injury report from June, 1994, and if there were any other medical information required to substantiate the injury and resultant claim that it was the responsibility of the Complainant to have obtained and submitted with his CA-7 form. In this instance, the Complainant failed to provide current and necessary medical information. The agency's policy on processing a disability compensation claim form CA-7 submitted by an employee is to complete the agency's portion, minus necessary medical information, as I have explained. This is the policy that was followed in the Complainant's case. The Complainant's disability had nothing to do with the manner in which the agency processed his disability compensation claim form CA-7.

I am aware of a similar on-the-job injury and resulting disability, sustained sometime in the past, by Guillermo Carmona, another employee assigned to the PISPC. Mr Carmona's case in its entirety was handled in accordance with agency policy, as was the Complainant's. I do recall some details pertaining to Mr Carmona's case. Agency records reveal that Mr Carmona obtained all the necessary medical information for processing his injury report, compensation claim, and other subsequent documents. My role in Mr Carmona's case was basically the same as the one I played in the Complainant's

Page _7_ of _9_ Pages                                              _____ Initials

## AFFIDAVIT

case; that is, as the Harlingen district's administrative officer I ensured that each case was handled in accordance with applicable agency policy and available medical documentation submitted by each employee.

I have no witnesses I want interviewed in conjunction with my affidavit.

I have nothing else to add to my affidavit.

Page _8_ of _9_ Pages _____ Initials

**Exhibit D**

I have read the above statement consisting of __9__ pages, and it is true and correct to the best of my knowledge and recollection. I have been given an opportunity to review the statement and make any changes, corrections, additions, and/or deletions. I have initialed each page and signed the statement below.

I declare, certify, verify, or state under penalty of perjury that the foregoing is true and correct. Executed on ___9/15/2000___ .

(Date)

_____ (Signature of Affiant)

SUBSCRIBED AND SWORN BEFORE ME AT:

__Harlingen, Cameron, TX__ ON THIS __15th__ DAY OF __September__

(City, County, State)

_____

(Witness)

Page __9__ of __9__ Pages

Initials

# PRIVACY ACT NOTICE TO COMPLAINANT INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to *INS* activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of INS employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____   _____
Signature of Interviewer       Signature of Witness (person providing statement)

Date: 9/15/00

Place: Harlingen Tx