PLAINTIFF'S EXHIBIT A
PAGE 1 OF 13

8

1  pre-mark some exhibits, and in part because I left my notes
2  at my office. I'm going to take this a little bit out of
3  order.
4        (Government Exhibit Number 3 marked.)
5    Q  (Ms. Masso) But, the court reporter has marked as
6  Government Exhibit Three (3) a document that I took out of
7  the investigative file.
8        MS. MASSO: Do you want to take a short break
9  to take that?
10       (Brief interruption.)
11   Q  (Ms. Masso) What I've marked as Government's
12  Exhibit Three (3) is a document that I took out of the EEO
13  investigative file which has been described to be a
14  description, a job description for a Detention Enforcement
15  Officer. Could you take a look at this for me and let me
16  know if that looks to be correct to you in terms of what the
17  job description was during the time-periods that are at issue
18  in your suit, which I believe to be from 1994 to the present
19  time, or at least to 2000? Let's say that. From 1994 to
20  2000.
21   A  (Witness reviews documents.) Yes, ma'am.
22   Q  Thank you. Can you tell me or provide me a brief
23  description of the accident or the incident that occurred
24  while you were in training in 1994 to knock you out of
25  commission, so to speak? What was the incident that resulted

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

PLAINTIFF'S EXHIBIT A
PAGE 2 OF 13

9

```
 1   in your injuries in 1994? Can you describe that for me?
 2        A    Are you looking for step-by-step like the training,
 3   when I started the training?
 4        Q    No. I guess what I would like to know is, pretend
 5   like I'm a friend of yours and I say, "Well, gee, how did you
 6   get hurt?" And it was during this training session from what
 7   I understand that occurred in 1994.
 8        A    I was ordered to go and take this training because
 9   it was mandatory training, part of the requirements to become
10   an officer -- I mean, to -- it was a new weapon that was
11   issued out to the officers.
12        Q    And what was the weapon?
13        A    It was called PR-24 side-handle baton.
14        Q    Okay.
15        A    It was a new weapon coming out mainly to restrain a
16   detained, an individual. And I was put through the training
17   and knowing that I had a disability, a prior disability, but
18   I was put through the training. And I took three days of
19   training, and I finally qualified after the second day, my
20   arm was injured.
21        Q    Okay. Well, let me ask you. You mentioned "prior
22   disability," and I thought I heard "after knowing prior
23   disability." Are you saying that you didn't want to take the
24   training?
25        A    I had doctor's orders not to be trained. I was
```

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

10

1  still on limited light duty at the time.
2      Q   And I take it that this prior disability -- or I'm
3  assuming that it's as a result of the injuries you sustained
4  while on an aircraft, a Continental aircraft?
5      A   Yes, ma'am.
6      Q   Okay.  Well, let's take this step-by-step.  Let's
7  first talk about this prior disability, all right, with
8  Continental aircraft.  All right?
9      A   Yes, ma'am.
10     Q   Now, you state that you were on limited duty status
11 at the time because of those injuries?
12     A   Yes, ma'am.
13     Q   And who was your doctor that put you on limited
14 duty status or who was the doctor that recommended that you
15 be on limited duty status?
16     A   My primary physician was Doctor Humberto Rivas.
17     Q   Now, did you talk to Doctor Rivas specifically
18 about this training that was coming up, and did he
19 specifically tell you not to participate in this training?
20     A   No, ma'am.  I did not speak to the doctor.
21     Q   Okay.  Do you know who did, if the doctor did speak
22 with anybody within the INS about your training and his
23 recommendation that you not participate in it?
24     A   I do not recall, ma'am.
25     Q   But, you did go through the training, and you

PLAINTIFF'S EXHIBIT A
PAGE 4 OF 13

```
 1   sustained an injury while going through the training?
 2   A   Yes, ma'am.
 3   Q   And this injury, how did it occur?
 4   A   The technique was used on me that -- the instructor
 5   was present, and the technique was used on me by another
 6   individual, another officer that was in training with me.  He
 7   was my partner, my training partner.  And he did the
 8   procedure as he was supposed to have done it, except I
 9   believe he didn't release it fast enough and the pressure was
10   applied to my shoulder and it injured my shoulder.
11   Q   And that shoulder was injured in this Continental
12   incident?
13   A   No, ma'am.
14   Q   No?  And so it's a different injury from what had
15   occurred to you or had occurred during the turbulence
16   experience on the Continental Airline plane?
17   A   It's a different injury, yes, ma'am.
18   Q   Now, did you immediately report your injury to your
19   supervisor at the time?
20   A   Which injury?
21   Q   The one that you sustained in your training
22   incident in 1994?
23   A   Yes, ma'am.
24   Q   And who was it that you reported that to?
25   A   My supervisor was -- my training officer and
```

PLAINTIFF'S EXHIBIT A
PAGE 5 OF 13

```
                                                                      12
 1   supervisor was George Gonzalez, and the incident was also
 2   videotaped.
 3        Q    Okay.  Do you have a copy of the videotape?
 4        A    No, ma'am.
 5        Q    Do you know if INS still has a copy of the
 6   videotape?
 7        A    No, ma'am, I have no knowledge of that.
 8        Q    You haven't seen this videotape since -- or have
 9   you ever seen the videotape?
10        A    Yes, ma'am.
11        Q    And when did you see the videotape?
12        A    I believe the third day after we qualified.
13        Q    And where was it that you saw the videotape?
14        A    In the training room.
15        Q    And who at that time had possession of the
16   videotape?
17        A    My supervisor, Mr. George Gonzalez.
18        Q    And I know that we -- or you've gone through an
19   administrative process relating to your discrimination claim.
20   Have you at all during that administrative process made a
21   specific request for a copy of that videotape?
22        A    No, ma'am.
23        Q    And to your knowledge, has any copy of that
24   videotape been retained or maintained by INS or anybody
25   working for INS?
```

PLAINTIFF'S EXHIBIT A
PAGE 6 OF 13

13

```
 1   A   I have no knowledge, ma'am.
 2   Q   So, after you reported your injury to Mr. Gonzalez,
 3   tell me what happened after that.
 4   A   After the injury was reported to my supervisor, I
 5   was issued out a CA-1.
 6   Q   What's a CA-1?
 7   A   The CA-1 is the Department of Labor form used to
 8   claim an injury, traumatic injury or illness, and I filed a
 9   CA-1. And I submitted it and went to seek medical treatment
10   on the third day.
11   Q   And who did you go to?
12   A   Doctor Homero -- Homero Rivas.
13   Q   And what did Doctor Rivas say?
14   A   He placed me -- he placed me on no duty until
15   further notice and started therapy and referred me over to a
16   neurosurgeon.
17   Q   Does Doctor Rivas have any specialties, or is he a
18   specialized doctor in anything that you're aware of?
19   A   I am not aware.
20   Q   And he referred you to who?
21   A   At that time, I believe it was Doctor Bill -- Bill
22   Snyder.
23   Q   And Doctor Snyder, what was his specialty?
24   A   Sports Medicine.
25   Q   And what did Doctor Snyder do?
```

14

1  A    He evaluated me and referred me over to another
2  doctor.
3  Q    And who did he refer you to?
4  A    To Doctor Mike Sweeney.
5  Q    And Doctor Sweeney, what did he do?
6  A    He ordered physical therapy and no duty until
7  further notice.
8  Q    And was Doctor Sweeney the last doctor to see you
9  on this injury, or did he refer you on? Let me ask it that
10 way.  Did Doctor Sweeney refer you to anybody else?
11 A    There was another doctor between Doctor Bill Snyder
12 and Doctor Sweeney, and it was a doctor by the name of Rock
13 (phonetic), I believe, but he only saw me once. He was
14 working out of Dallas, and he was making calls down here too.
15 Q    Okay. And in terms of Doctor Sweeney, he put you
16 -- he said, "No work until further notice," right?
17 A    Yes, ma'am.
18 Q    And how long did that last?
19 A    I do not recall, ma'am.
20 Q    Did you ever return to work in 1994?
21 A    Yes, ma'am, I did.
22 Q    Do you remember approximately when?
23 A    The Agency wrote a letter to the doctor -- I stand
24 corrected. The Agency -- there was another doctor by the
25 name of Goldsmith. And the Agency wrote a letter to Doctor

15

1  Goldsmith advising Doctor Goldsmith that there was a position
2  available and if I was sent back, I was going to do the
3  duties of a Control Officer, which I immediately -- the
4  doctor questioned me if I could perform those duties, and I
5  said, "Yes."
6     Q   And is a Control Officer different than a Detention
7  Officer?
8     A   It's one of the duties of being a Detention
9  Officer.
10    Q   And when you say it's one of the duties of being a
11 Detention Officer, I guess that -- here's my question. Is
12 there a job at the INS that is specifically Detention Officer
13 and then a second job that is Control Officer?
14    A   No, ma'am.
15    Q   But, they had something available for you to do
16 that would just be solely with the job duty of Control
17 Officer that would be within Detention Officer, --
18    A   Correct.
19    Q   -- the umbrella? Okay. And what does a -- I don't
20 know what Control Officer means or what it means in the
21 context of what a Detention Officer does. So can you
22 describe for me what a Control Officer duties would be?
23    A   A Control Officer, at the time that the doctor
24 received the letter from the Agency, it clearly stated that I
25 was to review -- to submit -- not submit, input videos for

PLAINTIFF'S EXHIBIT A
PAGE 9 OF 13

16

```
 1       the legal rights that the aliens have, monitor all the
 2       cameras and use the speaker system to notify the aliens that
 3       they had to report to an individual.
 4   Q   And this was Doctor Goldsmith that you were talking
 5       to about this?
 6   A   Yes, ma'am.
 7   Q   And Doctor Goldsmith, what did he do after you told
 8       him that you could handle doing the duties of a Control
 9       Officer? Did he write a letter?
10   A   I do not recall, ma'am.
11   Q   Do you remember if anything was submitted to INS in
12       writing indicating that you were able to do the duties of a
13       Control Officer?
14   A   The doctor, Doctor Goldsmith did question me, and I
15       did say that I was able to perform those duties, mainly
16       because it was a sitting position. And he said that if I
17       could perform them that he'd let me go back on limited light
18       duty. And that was the agreement we had between the doctor
19       and the Agency.
20   Q   Okay. And are you -- do you know if the doctor
21       communicated this to the Agency directly in writing or
22       verbally or both?
23   A   I have no knowledge, ma'am.
24   Q   Then, so, when was this that you were put on
25       Control Officer duties?
```

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

PLAINTIFF'S EXHIBIT A
PAGE 10 OF 13

17

1  A  I believe it was the -- I can't really recall the
2  date, but it was -- it was when the Agency sent that letter
3  to the doctor. It was within a day or two, I believe.
4  Q  And would you -- and I realize that it's hard to
5  remember specifics at this point in time. But, would you say
6  that it was probably sometime in the latter part of 1994?
7  Or, are we talking within a couple of months after you
8  sustained your training injury, or are we talking a year or
9  two?
10 A  A couple of months.
11 Q  A couple of months. Now, from the time that you
12 came back doing Control Officer duties up until -- I believe
13 that the point that we're getting to is August of 1996, was
14 that all that you were doing during that time-period was the
15 Control Officer duties, and that was it?
16 A  Yes, ma'am.
17 Q  And did you have any difficulties -- during that
18 time-period from when you came back on board in 1994 to 1996,
19 did you have any difficulties performing the functions of
20 Control Officer?
21 A  No, ma'am.
22 Q  Were there any other functions that Detention
23 Officers were required to do at the time? Were there any
24 other functions there within their job description that you
25 thought you could have been able to do at that time?

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

PLAINTIFF'S EXHIBIT A
PAGE 11 OF 13

```
 1    A    I recall that I was assigned to what they called
 2  Building One, the supervisory building, the management
 3  building, as a clerk -- not a clerk, as a door greeter, more
 4  or less. That was the other duty they assigned me to. And
 5  that's what I performed until 1996.
 6    Q    Now, what happened in August of '96 to cause you to
 7  stop working and doing your job duties as a Control Officer?
 8    A    The Agency refused to let me come back into the
 9  Control Officer position.
10    Q    Well, my - and correct me if I'm wrong. My
11  understanding from reading the Complaint is that from August
12  to October, you were on leave without pay status. And then,
13  it was in October that you came back and asked to be put back
14  on light duty or limited duty status. And I had the
15  impression that from August to October of '96, you were
16  unable to do the job of Control Duty Officer because of
17  medical reasons at the time. Am I incorrect in that?
18    A    No, ma'am. You are correct.
19    Q    Okay. So, if you could describe for me what
20  happened in August, 1996, to cause you to cease working as
21  Control Duty Officer at that point?
22    A    I was sent by the Department of Labor to Houston,
23  Texas, on various days to be evaluated by another Department
24  of Labor physician. I came back, and I was in so much severe
25  pain, because I had to drive all the way up there and drive
```

                                                                    18

DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608 • MISSION, TX 78573
PH: (956) 580-2778 • CELL 330-9180 • FAX 580-3148

19

```
 1   all the way back, that I couldn't stand the pain.  So, I
 2   spoke to my doctor, and he says, "Let's give you physical
 3   therapy and see if you recuperate so you can go back," which
 4   he did.  I attempted to go back in October, and I was denied.
 5        Q    Okay.  So, you're saying that due to your actually
 6   having to go through the travel to see the doctor and
 7   whatever tests that they performed, as a result of that, you
 8   were in a lot of pain?
 9        A    Yes, ma'am.
10        Q    And did a doctor give you an excuse, you know, to
11   not return to work?
12        A    Yes, ma'am.
13        Q    And who was the doctor on that; do you remember?
14        A    No, ma'am.
15        Q    And do you remember whether this excuse indicated a
16   beginning time and an end time for you not to be working?
17        A    I do not recall that.
18        Q    So, when you came back in October and said, "I'd
19   like to start back work again," who did you first go to?
20        A    My supervisors, Mr. George Gonzalez and Mr. Jesse
21   Rosales.
22        Q    And what did they say?
23        A    They told me that they were informed by management
24   that I was not to return back to work.
25        Q    And did they say why?
```

20

1   A   That I was instructed that not to return to work
2   because there was no more limited duty for me.
3   Q   And what did you do after hearing that information?
4   A   I advised them about the agreement that the Agency
5   had with my doctor, and nothing ever came out of it. And I
6   went back to my doctor who advised me that if I was not to be
7   given limited duties, then I couldn't perform the full
8   duties.
9   Q   And was this Doctor Goldsmith or someone else?
10  A   Doctor Rivas.
11  Q   Doctor Rivas. Now, when you referred to this prior
12  agreement with the Agency and your doctor, was that between
13  Doctor Rivas and the Agency, or Doctor Goldsmith and the
14  Agency?
15  A   Doctor Rivas is my primary physician. Doctor
16  Goldsmith would present the reports to Doctor Rivas. I
17  showed the copy of the document to Doctor Rivas, and he made
18  the final decision, that the neurosurgeon would make the
19  decision and I would take the decision that neurosurgeon or
20  the orthopedic specialist did to Doctor Rivas and let him
21  make the final decision.
22          MS. MASSO: Okay. I'll object on the basis of
23  responsiveness.
24  Q   (Ms. Masso) My question, when you refer to an
25  agreement between the doctor and the Agency, was the